**RECORD NO. 13-2050**

# In The
# United States Court Of Appeals
# For The Fourth Circuit

## SOUTHERN APPALACHIAN MOUNTAIN STEWARDS; SIERRA CLUB; APPALACHIAN VOICES,

*Plaintiffs – Appellees,*

### v.

## A & G COAL CORPORATION,

*Defendant – Appellant,*

_____

VIRGINIA COAL AND ENERGY ALLIANCE, INCORPORATED;
VIRGINIA MINING ASSOCIATION; VIRGINIA MINING ISSUES GROUP;
AMERICAN FOREST AND PAPER ASSOCIATION; AMERICAN PETROLEUM INSTITUTE;
NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; NATIONAL ASSOCIATION OF
HOME BUILDERS; NATIONAL MINING ASSOCIATION; UTILITY WATER ACT GROUP,

*Amicus Supporting Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## AT BIG STONE GAP

_____

## BRIEF OF APPELLEES

_____

Isak J. Howell
LAW OFFICE OF ISAK HOWELL
117 East Washington Street
Suite 1
Lewisburg, WV  24901
(540) 998-7744

Joseph M. Lovett
APPALACHIAN MOUNTAIN
 ADVOCATES
P.O. Box 507
Lewisburg, WV  24901
(304) 645-9006

*Counsel for Appellees*

*Counsel for Appellees*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2050__    Caption: __Southern Appalachian Mountain Stewards, et al. v A&G Coal Corporation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Southern Appalachian Mountain Stewards__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations? ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/ Isak Howell_____    Date: _____2/2/2014_____

Counsel for: __Southern Appalachian Mtn. Stewards__

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____2/3/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__s/ Isak Howell_____        _____2/2/2014_____
(signature)                                (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2050__    Caption: <u>Southern Appalachian Mountain Stewards, et al. v A&G Coal Corporation</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.      Does party/amicus have any parent corporations? ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Isak Howell                          Date: _____2/2/2014_____

Counsel for: Sierra Club_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____2/3/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Isak Howell_____                          _____2/2/2014_____
(signature)                                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2050__    Caption: Southern Appalachian Mountain Stewards, et al. v A&G Coal Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Appalachian Voices
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Isak Howell                              Date:        2/2/2014

Counsel for: Appalachian Voices

# CERTIFICATE OF SERVICE
**************************

I certify that on        2/3/2014        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Isak Howell                                            2/2/2014
(signature)                                                 (date)

- 2 -

# Table of Contents

**Page:**

Table of Authorities ................................................................................. iii

Statement of Issues.................................................................................1

Statement of the Case.............................................................................1

Summary of Argument.............................................................................3

Argument.................................................................................................4

    Standard of Review.............................................................................4

I.    Factual Background.........................................................................6

II.    Legal Framework ............................................................................10

    a.    The Clean Water Act.................................................................10

    b.    The "Permit Shield" provision and EPA policy ......................13

III.    Straightforward Application of *Piney Run* and *Ketchikan Pulp* Demonstrates That A&G's Selenium Discharges are Not Protected by the Permit Shield ...........................................................16

    a.    Unlike A&G, the permit applicant in *Piney Run* specifically disclosed the pollutant, and that disclosure was critical to finding the permit shield applicable .................17

    b.    A&G's disclosures were far less complete than the disclosures in *Ketchikan Pulp*, where the permit applicant's failure to specifically identify individual pollutants was crucial to EAB's decision that the permit shield did not apply ...................................................................22

IV.    In Addition to Violating the VA/NPDES Coal Mine
       Application Instructions, A&G's Disclosures Were Inadequate
       Under Federal and State Regulations Governing Toxic
       Pollutants, Regardless of A&G's Subjective Knowledge ................. 28

V.     A&G's "Subjective Knowledge" and "General Knowledge"
       Arguments are Untenable Obfuscations Already Rejected by
       This Court ................................................................................ 36

VI.    The District Court's Decision to Disallow the Untimely
       Submission of Inadmissible Evidence Was Justified and Was
       Not an Abuse of Discretion ................................................. 41

       a.    The District Court decision is correct ....................... 41

Length of Delay ................................................................. 46

Reason for Delay ................................................................ 47

Prejudice ......................................................................... 48

Conclusion ....................................................................... 52

Certificate of Compliance

Certificate of Filing and Service

ii

# Table of Authorities

**Page(s):**

**Cases:**

*Aikens v. Ingram*,
    652 F.3d 496 (4th Cir. 2011) ........................................................... 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................... 5

*Atlantic States Legal Foundation v. Eastman Kodak*,
    12 F.3d 535 (2d Cir. 1993) ............................................................. 27

*B & J Enters. v. Giordano*,
    329 Fed. Appx. 411 (4th Cir. 2009) ..................................... 44, 47

*Beartooth Alliance v. Crown Butte Mines*,
    904 F. Supp. 1168 (D. Mont. 1995) ............................................. 12

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ....................................................................... 18

*Colony Apartments v. Abacus Project Mgmt., Inc.*,
    197 F. App'x 217 (4th Cir. 2006) ......................................... 43, 44

*Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*,
    33 F.3d 390 (4th Cir.1994) .............................................................. 6

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ......................................................... 6

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) ....................................................... 20

*E.I. du Pont de Nemours & Co. v. Train*,
    430 U.S. 112 (1977) ....................................................................... 14

*Edwards v. Princess Cruise Lines*,
    471 F. Supp. 2d 1027 (N.D. Cal. 2007) ................................. 45, 50

*Estes v. King's Daughters Med. Ctr.*,
    59 Fed. Appx. 749 (5th Cir. 2003) ...............................................................46

*F.D.I.C. v. Cashion*,
    720 F.3d 169 (4th Cir. 2013) ........................................................................5

*Gaskins v. BFI Waste Servs.*,
    281 Fed. Appx. 255 (4th Cir. 2008) ...........................................................44

*Hickenbottom v. Nassan*,
    2007 U.S. Dist. LEXIS 24336 (W.D. Pa. 2007)..................................... 44-45

*In Re Ketchikan Pulp Co.*,
    7 E.A.D. 605, 1998 WL 284964 (Appeal No. 96-7 May 15, 1998).......*passim*

*In re: Earl Roggenbuck Farms*,
    51 B.R. 913 (Bank. E. D. Mich. 1985) ........................................................45

*Inland Steel Co. v. EPA*,
    574 F.2d 367 (7th Cir. 1978) ................................................................ 13-14

*Marine Bank v. Meat Counter, Inc.*,
    1986 WL 5217 (N.D. Ill. 1986) ...................................................................46

*Nader v. Blair*,
    549 F.3d 953 (4th Cir. 2008) ........................................................................6

*Noel v. Artson*,
    641 F.3d 580 (4th Cir. 2011) ........................................................................5

*NRDC v. Costle*,
    568 F.2d 1369 (D.C. Cir. 1977)..................................................................11

*Ohio Valley Environmental Coalition, et al. v. Fola Coal Co.*,
    2013 WL 9709957 (S.D. W. Va. 2013)........................................................20

*Ohio Valley Envt'l Coalition v. Hobet Mining*, LLC,
    723 F. Supp. 2d 886 (S.D. W. Va. 2010) ....................................................12

*Ohio Valley Envt'l Coalition v. Patriot Coal Co.*,
    2011 WL 6101921 (S.D. W. Va. 2011)........................................................40

iv

*Orsi v. Kirkwood*,
  999 F.2d 86 (4th Cir. 1993) ....................................................................46, 47

*Perini Corp. v. Perini Construction, Inc.*,
  915 F.2d 121 (4th Cir. 1990) ...........................................................................4

*Piney Run Preservation Ass'n v.*
*County Com'rs of Carroll County, Maryland*,
  268 F.3d 255 (4th Cir. 2001) ................................................................*passim*

*Sierra Club v. Powellton Coal Co., LLC*,
  662 F. Supp. 2d 514 (S.D. W. Va. 2009) ........................................................11

*Sikorsky Aircraft Corp. v. U.S.*,
  105 Fed.Cl. 657 (Fed. Cl. 2012) ......................................................................5

*Snoznik v. Jeld-Wen, Inc.*,
  2010 WL 1924483 (W.D.N.C. 2010) .............................................................45

*Symbionics Inc. v. Ortlieb*,
  432 Fed. Appx. 216 (4th Cir. 2011) ..............................................................44

*Thompson v. E. I. DuPont de Nemours & Co.*,
  76 F.3d 530 (4th Cir. 1996) ...........................................................................44

*U.S. v. Arch Coal, Inc.*,
  829 F. Supp. 2d 408 (S.D. W. Va. 2011) .......................................................40

*U.S. v. Tennessee Gas Pipeline Co.*,
  1993 WL 594155 (W.D. La. April 14, 1993) .................................................18

*West Virginia Highlands Conservancy, Inc. v. Huffman*,
  625 F.3d 159 (4th Cir. 2010) .........................................................................12

**Statutes:**

33 U.S.C. § 1251 ...........................................................................................10

33 U.S.C. §§ 1251 *et seq.*
(Federal Water Pollution Control Act (Clean Water Act)).............................*passim*

33 U.S.C. § 1311 (Sec. 301) ............................................................10, 11, 13, 15

33 U.S.C. § 1311(a) ...................................................................10, 13

33 U.S.C. § 1311(d) ..........................................................................14

33 U.S.C. § 1312 ..............................................................................13

33 U.S.C. § 1316 ..............................................................................13

33 U.S.C. § 1317 ..............................................................................13

33 U.S.C. § 1319 ..............................................................................13

33 U.S.C. § 1342 ..............................................................................10

33 U.S.C. § 1342(a) ..........................................................................11

33 U.S.C. § 1342(b) ..........................................................................10

33 U.S.C. § 1342(k) ....................................................................13, 18

33 U.S.C. § 1343 ..............................................................................13

33 U.S.C. § 1365 ..............................................................................13

33 U.S.C. § 1362(5) ..........................................................................13

33 U.S.C. § 1362(6) ..........................................................................13

33 U.S.C. § 1362(7) ..........................................................................13

33 U.S.C. § 1362(12) ........................................................................13

33 U.S.C. § 1362(12)(A) ..................................................................12

33 U.S.C. § 1362(14) ........................................................................13

CWA § 301 ......................................................................................12

CWA § 402(k) ......................................................................13, 14, 15

Va. Code § 45.1-254 ........................................................................10

**Regulations:**

9 VAC § 25-31-100.................................................................11

9 VAC § 25-31-100(H)(7)(e)...................................................31

9 VAC § 25-31-100(H)(7)(g)..............................................31, 32

9 VAC § 25-31-220(D)............................................................11

9 VAC § 25-31-220(D)(1)(c)...................................................11

9 VAC § 25-260-140.B.........................................................7, 11

40 C.F.R. § 122.21................................................................29

40 C.F.R. § 122.21(a)(2)(iv).............................................31, 32

40 C.F.R. § 122.21(g)...........................................................30

40 C.F.R. § 122.21(g)(7)(v)..................................................30

40 C.F.R. § 122.21(g)(7)(vi)(B)............................................30

40 C.F.R. § 122.5................................................................13

40 C.F.R. § 401.15...........................................................6, 12

40 C.F.R. Parts 400-471.......................................................14

40 CFR Part 122..................................................................31

**Rules:**

Fed. R. Civ. P. 6(b) ......................................................43, 50-51

Fed. R. Civ. P. 26(e)............................................................42

Fed. R. Civ. P. 56..............................................................51

Fed. R. Civ. P. 56(c)..................................................................................5

Fed. R. Civ. P. 56(e).................................................................42, 50, 51

**Other:**

45 Fed. Reg. 33, 516, 33, 526 (May 19, 1980).......................................25

H.R. Rep. on H.R. 11896, contained in "A Legislative History of the Water
Pollution Control Act Amendments of 1972")........................................14

## Statement of Issues

1. Did the District Court correctly rule that the Clean Water Act "permit shield" does not apply to Appellant A&G's ongoing discharges of the toxic pollutant selenium, where the controlling law is that "[t]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA," where the permit application specifically required A&G to submit selenium data, and where A&G made no selenium disclosure at all?

2. Did the District Court act within its discretion in denying A&G's attempt to submit untimely and inadmissible summary judgment materials, materials which were submitted without any justification for the delay, long after full summary judgment briefing, summary judgment hearing, and every other applicable deadline?

## Statement of the Case

The central issue in this case is whether this Court's decision *Piney Run* should be overturned.  This case deals with the Clean Water Act "permit shield." Controlling Fourth Circuit precedent regarding the permit shield makes clear that "[t]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA."  *Piney Run Preservation Association v. County Commissioners of Carroll County, Maryland*, 268 F.3d 255, 267 (4th Cir.

2001) (quoting and agreeing with the analysis *In Re Ketchikan Pulp Co.*, 7 E.A.D. 605, 620-21, 1998 WL 284964 (Appeal No. 96-7 May 15, 1998)).  In this appeal there is no question that A&G Coal Corporation ("A&G") failed to provide in its permit application any disclosure whatsoever about the toxic pollutant selenium, despite a clear and specific requirement in the permit application instructions to provide selenium data for each permitted outfall.  A&G's disclosures fall far short of the standard set in *Piney Run*, and far short of the pollutant disclosures examined in both *Piney Run* and *Ketchikan Pulp*.  Presented with no information regarding selenium in the permit application, the state permit authority had no opportunity to reasonably contemplate selenium discharges.  *Piney Run* is clear on the question presented, controlling in this Circuit, and it mandates denial of A&G's appeal.

The second issue in this case is whether the District Court abused its discretion in denying A&G's motion to submit untimely summary judgment material.  A&G's motion was presented without any citation to an applicable rule or case.  The motion was submitted months after materials supporting summary judgment motions were due.  In fact, all summary judgment deadlines had expired and the motions were ripe for decision.  Numerous comparable cases hold that it is not an abuse of discretion to deny such motions, especially where, as here, the movant failed to demonstrate excusable neglect.

2

## Summary of Argument

A straightforward application of the Fourth Circuit's controlling precedent in *Piney Run*, which adopts the U.S. EPA's formal ruling in *Ketchikan Pulp*, mandates denial of A&G's appeal. In both cases, the respective permit applicants' disclosures to the permitting authority at the time of permit issuance were scrutinized and held to be the foundation of the permit shield analysis. In *Piney Run*, the Court found the shield did apply to the defendant's discharges of heat, in large part because the applicant had clearly disclosed it would discharge heat as a pollutant. In *Ketchikan Pulp*, which was examined and approved by this Court in *Piney Run*, the U.S. EPA's Environmental Appeals Board held that the shield did not apply where the applicant failed to specifically disclose the potential to discharge the pollutant at issue, despite the applicant's detailed disclosure of the nature of its industrial activity and disclosure of other chemicals. A&G falls far short of even the disclosures that EPA found insufficient in *Ketchikan Pulp*: A&G made no disclosure of selenium, provided no selenium data, and provided no description of how selenium would or could be discharged from its coal mine. A&G claims that its disclosure that it would operate a "bituminous coal mine" is compliance with the CWA's disclosure requirements. There is no reading of *Piney Run* or *Ketchikan Pulp* that supports that claim.

The record demonstrates that A&G failed to satisfy a clear, unconditional requirement in the Virginia coal mining VA/NPDES permit application instructions that each applicant provide selenium effluent data for every outfall at its mine. Under this Court's precedent, such application instructions are binding. Further, A&G's failure to make adequate permit disclosures in its application deprived the permit authority of any basis for expecting or contemplating selenium discharges from A&G's mine so that it could craft a permit that would protect water quality. A&G failed to show a genuine issue of material fact on either of the two necessary elements of its affirmative defense of the permit shield. Consequently, the permit shield cannot apply, and A&G's appeal fails.

As to A&G's untimely motion to submit summary judgment material, the District Court clearly did not abuse its discretion. A&G submitted an opaque, untimely and weakly supported motion that failed to satisfy the demanding "excusable neglect" standard applicable to such requests. According to the precedent of this Court and many others, the District Court was well within its discretion to deny A&G's motion.

## Argument

### Standard of Review

The Court reviews the District Court's grant of summary judgment de novo. *Perini Corp. v. Perini Construction, Inc.*, 915 F.2d 121, 123 (4th Cir. 1990). A

party is entitled to summary judgment when it shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any factual matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  To survive a motion for summary judgment, however, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]"  *Id.* at 256.  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of its position.  *Anderson*, 477 U.S. at 252.  For an affirmative defense such as the permit shield, the movant is entitled to judgment if it provides evidence that negates at least one essential element of the opposing party's affirmative defense.  *Sikorsky Aircraft Corp. v. U.S.*, 105 Fed.Cl. 657, 667 (Fed. Cl. 2012).

This Court reviews the district court's application of contract principles to a NPDES permit de novo, but reviews its findings of fact with respect to extrinsic matters for clear error.  *Piney Run Preservation Ass'n v. County Com'rs of Carroll County, Maryland*, 268 F.3d 255, 269 (4th Cir. 2001).

This Court reviews the District Court's evidentiary and scheduling decisions for abuse of discretion.  *F.D.I.C. v. Cashion*, 720 F.3d 169, 173 -174 (4th Cir. 2013).  *See also Noel v. Artson,* 641 F.3d 580, 591 (4th Cir. 2011) (stating that a

district court's evidentiary decisions are reviewed for abuse of discretion); *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir.1994) (stating the district court's decisions regarding briefing and hearing on summary judgment motions are reviewed for abuse of discretion); *Nader v. Blair*, 549 F.3d 953, 958-59 (4th Cir. 2008) (stating that the Court reviews a district court's denial of a motion to allow further discovery before ruling on a summary judgment motion under an abuse of discretion standard). The abuse of discretion standard is much more deferential than the de novo standard. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). The standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the Court does not reverse merely because it would have come to a different result in the first instance. *Aikens v. Ingram*, 652 F.3d 496, 504 (4th Cir. 2011).

## I.    Factual Background

Selenium is a toxic pollutant subject to the specific regulation of toxic metals under the Clean Water Act. 40 C.F.R. § 401.15. Appellant A&G Coal Corporation ("A&G") is discharging large amounts of selenium, well in excess of the applicable water quality standard,[1] from two artificial ponds located on its

---

[1] A&G and the amici assert that A&G's selenium discharges do not violate Virginia water quality standards. A&G Brief at 6, footnote 2; First Amici Brief at 5, footnote 2. The record proves this assertion false. Proof of such violations was not necessary to obtain summary judgment, but it bears emphasis that the record proves the violations. The chronic selenium criterion is 5.0 μg/L and represents

Kelly Branch Surface Mine in Wise County, Virginia.  Defendant holds Virginia

Coal Surface Mining Operation (CSMO) Permit 1102052 and Virginia National

Pollutant Discharge Elimination (VA/NPDES) Permit 0082052, but neither permit

authorizes the discharge of selenium.  The in-stream ponds flow directly into

tributaries of Callahan Creek.  Callahan Creek is a tributary of the Powell River, a

traditionally navigable water of the United States, and is thus subject to the

protections of the Clean Water Act.

It is undisputed for purposes of this appeal that A&G is discharging

selenium from point sources into waters of the United States without express

authorization.  Before and during the discovery phase of this action, Southern

Appalachian Mountain Stewards, Sierra Club and Appalachian Voices

(collectively, "SAMS") tested discharges from the two ponds at the Kelly Branch

mine, and from the streams directly downstream from the pond spillways.  Taken

---

the maximum concentration to which aquatic life can be exposed for a 96-hour
period without suffering adverse effects.  9 VAC § 25-260-140.B (table).  The
four-day average is not to be exceeded more than once in a three-year period.  *Id.*
at n.2.  SAMS' laboratory analyses show three four-day averages that exceed 5.0
µg/L at Pond 08A (16.9 µg/L, 17.575 µg/L, and 18.325 µg/L), J.A. 118-56, and
three four-day averages that exceed 5.0 µg/L at Pond 11A (11.025 µg/L, 10.525
µg/L, and 10.3 µg/L), J.A. 209-45.  A&G's own sampling confirms the same
exceedances.  J.A. 157-97, 249-88.  Three exceedances is more than one
exceedance, and all exceedances occurred during discovery, so it was well within a
three-year period.  Thus, the record demonstrates that A&G has violated the
selenium water quality standard.

together, the various lab results, including those from A&G's own sampling, prove

that ponds 08A and 11A are discharging selenium at high levels.

A&G's VA/NPDES Permit for Ponds 8A and 11A does not mention

selenium and does not expressly authorize any amount of selenium to be

discharged.  J.A. 289-312.  (VA/NPDES Permit 0082052).  Indeed, VA/NPDES

permit 0082052 explicitly provides that the discharge of pollutants not specifically

limited in the permit is a violation of the permit.  Management Requirement

Condition (n)(2) provides in full: "The discharge of any pollutant more frequently

than, or at a level greater than that identified and authorized by this permit, shall

constitute a violation of the terms and conditions of this permit."  J.A. 304.

Further, a separate provision, Special Condition (p)(2), provides in full:

> Any and all product, material, industrial wastes, and/or other wastes
> resulting from the purchase, sale, mining, extraction, transport,
> preparation and/or storage of raw or intermediate materials, final
> product, by-product or wastes, shall be handled, disposed of, and
> [sic] and/or stored in such a manner so as not to permit discharge of
> such product, materials, or industrial wastes and/or other wastes to
> State waters, except as expressly authorized herein.

J.A. 305.  These are abundantly clear permit conditions.  A&G has not challenged

their applicability to its selenium discharges.

Even more importantly for this appeal, the applicable VA/NPDES permit

application instructions expressly require each applicant to characterize the

discharge from each outfall by submitting the results of tests for a range of

pollutants, including total selenium.  J.A. 356.  The application instructions

provide:

> Effluent Characteristics - The applicant must collect data or utilize existing data to report information on the pollutants discharged for each existing outfall. (This part does not apply to proposed outfalls or haulroad sumps.) At least one analysis must be provided for each parameter listed in the table. <u>In addition to the parameters listed in the table, information is required regarding the following pollutants; [] Total Selenium,[].</u> The applicant must report at least one analyses[sic] for each pollutant.  Please attach certificate of analyses or reference appropriate information on file at the Division.

J.A. 356 (emphasis added).  In addition to selenium, this provision of the

application instructions lists out every toxic pollutant found in Table III of 40

C.F.R. Part 122 Appendix D.

In clear violation of the instructions, A&G did not disclose any data or make

any mention of selenium in its application.  J.A. 337-352 (A&G's complete permit

application, which contains no selenium data or reference).  A&G does not

challenge the lack of selenium disclosure or the requirement of the application

instructions.  As discussed below, the EPA permit shield policy, the state and

federal regulations governing application disclosures, and the permit application

itself all contain a special focus on toxic pollutants such as selenium.  A&G had an

affirmative duty both to know, by water quality testing if necessary, and to disclose

its potential to discharge toxic pollutants such as selenium.  A&G failed to perform

its duties of investigation and disclosure.  A&G's minimal disclosures gave no

indication of any toxic pollutant discharges in its wastestream, so the permit

authority had no opportunity to anticipate and regulate such pollutants.

## II.    Legal Framework

### a.    The Clean Water Act

This action arises under the Federal Water Pollution Control Act, 33 U.S.C.

§§ 1251 *et seq.*, commonly known as the Clean Water Act.  Congress passed the

Clean Water Act to "restore and maintain the chemical, physical, and biological

integrity of the Nation's waters."  33 U.S.C. § 1251.  The Act's primary

mechanism for achieving that goal is Section 301's prohibition on the "discharge

of any pollutant by any person" into waters of the United States, except when

authorized by and in compliance with certain provisions of the Act.  33 U.S.C. §

1311(a).  One such provision is the National Pollution Discharge Elimination

System ("NPDES"), under which the United States Environmental Protection

Agency ("EPA") or an authorized state may issue permits for the discharge of

pollutants.  *Id.* § 1342.  In Virginia, NPDES permits for coal mines are issued by

the Department of Mines, Minerals, and Energy ("DMME"). *See* 33 U.S.C. §

1342(b) (authorizing states to administer NPDES programs); Va. Code § 45.1-254

(vesting authority for issuance of NPDES permits for coal mines in Virginia with

the Director of the DMME).

NPDES permits allow the discharge of pollutants on the condition that such discharges will comply with all CWA requirements. *Id.* § 1342(a). "The issuance of a NPDES permit does not authorize the recipient to pollute at will." *Sierra Club v. Powellton Coal Co., LLC*, 662 F. Supp. 2d 514, 516 (S.D. W. Va. 2009). Permitting authorities may not exempt any pollutant discharges from Section 301's prohibition. *NRDC v. Costle*, 568 F.2d 1369, 1373–77 (D.C. Cir. 1977).

The Virginia permitting authority has a duty, in issuing any NPDES permit, to include measures necessary to achieve water quality standards. 9 VAC § 25-31-220(D). Such measures must include effluent limits if the discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a Virginia numeric criteria within a Virginia water quality standard for any individual pollutant. 9 VAC § 25-31-220(D)(1)(c). Virginia has established numeric water quality standards for selenium at levels necessary to protect aquatic life. Virginia's aquatic life selenium water quality standards include both acute and chronic criteria. 9 VAC § 25-260-140.B (table). Virginia's ability to perform its duty necessarily rests on NPDES permit applicants' compliance with the state's disclosure requirements, which include special provisions and disclosures for mining operations discharging toxic pollutants. *See* 9 VAC § 25-31-100 (required information from applicants).

11

As this Court has stated, "the CWA bans '*any* addition of *any* pollutant to navigable waters from *any* point source.' *See* 33 U.S.C. § 1362(12)(A) (emphasis added). 'Any' is a powerful statutory term.  The Clean Water Act uses it frequently."  *West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 165 (4th Cir. 2010).  *See also Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168 (D. Mont. 1995) (stating the elements of an unpermitted discharge claim).  It is not a defense that the person discharging the pollutant did not initially cause the discharge or create the pollutant.  *Huffman*, 625 F.3d at 167.

SAMS alleged that A&G's selenium discharges are "unpermitted discharges," which violate Section 301 of the CWA because they are not authorized by A&G's NPDES permit.  J.A. 25-26.  A party may establish an unpermitted discharge under the Clean Water Act by showing that a defendant is (1) a person who (2) is discharging or adding any pollutant[2] (3) from a point source (4) into waters of the United States (5) without authorization under the CWA. *See*

---

[2] Selenium, the only pollutant at issue in this appeal, has been designated a toxic pollutant by the EPA.  40 C.F.R. § 401.15.  As the District Court for the Southern District of West Virginia has observed:

> Selenium impacts the reproductive cycle of many aquatic species, can impair the development and survival of fish, and can even damage gills or other organs of aquatic organisms subjected to prolonged exposure.  It can also be toxic to humans, causing kidney and liver damage, and damage to the nervous and circulatory systems.

*Ohio Valley Envt'l Coalition v. Hobet Mining*, LLC, 723 F. Supp. 2d 886, 900 (S.D. W. Va. 2010).

33 U.S.C. § 1311(a) (establishing prohibition); *id.* at §§ 1362(5), (6), (7), (12), (14) (defining terms).

### b.    The "Permit Shield" provision and EPA policy

A&G does not contest that it is a person discharging the toxic pollutant selenium from point sources to the waters of the United States and is thus subject to Section 301's prohibition. Rather, it relies solely on the affirmative defense of the "permit shield" provision of Clean Water Act section 402(k) to argue that its selenium discharges are implicitly authorized by the CWA despite the absence of any mention of selenium in A&G's VA/NPDES permit.

Section 402(k) of the Clean Water Act states that:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health.

33 U.S.C. § 1342(k); *see also* 40 C.F.R. § 122.5.  Sections 1319 and 1365 provide enforcement authority and sections 1311, 1312, 1316, 1317, and 1343 prescribe effluent limitations.

The primary purpose of Section 402(k), as stated in the legislative history of the Act, is to prevent a permit holder from having to comply with effluent limitations that are promulgated during the term of its permit, unless the limitations control toxic pollutants injurious to human health.  *See Inland Steel Co. v. EPA*,

13

574 F.2d 367, 370 (7th Cir. 1978) ("The purpose of the provision is to assure that the mere promulgation of any effluent limitation or other limitation, a standard, or a thermal discharge regulation, by itself will not subject a person holding a valid permit to prosecution." (quoting H.R. Rep. on H.R. 11896, contained in "A Legislative History of the Water Pollution Control Act Amendments of 1972" 815)).

EPA periodically updates the effluent limitations that it imposes on different categories of pollutant point sources as pollution control technologies in those industries improve.  *See* 33 U.S.C. § 1311(d) (requiring periodic revision of technology-based effluent limitations); 40 C.F.R. Parts 400-471 (prescribing technology-based effluent limitations for different industrial categories, including coal mines).  The permit shield is thus intended to allow permittees to continue utilizing their existing treatment technologies until permit reissuance, at which time they must make improvements to comply with the new effluent standards. The United States Supreme Court echoed that interpretation in *E.I. du Pont de Nemours & Co. v. Train*:

> The purpose of § 402(k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, § 402(k) serves the purpose of giving permits finality.

430 U.S. 112, 138 n.28 (1977).

The meaning of the phrase "compliance with a permit," which is critical to the scope of the permit shield, has been interpreted by EPA and by this Court. EPA has issued a formal interpretation of Section 402(k) in a policy document titled "Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits, April 11, 1995." J.A. 329-333. According to the policy, discharges from permittees are in "compliance with a permit" and, consequently, Section 301 as long as the discharges do not violate the terms of the permit and contain only pollutants that are "specifically identified in writing as present in facility discharges during the permit application process" or are "constituents of wastestreams, operations or processes that were clearly identified in writing during the permit application process." *Id.* at 2–3. EPA's policy explicitly affirms that the permit applicant bears a special responsibility of clear and full disclosure of the pollutants in its discharges, including compliance with all information requests by the permit authority. The policy also makes clear that an applicant must disclose specific information about the presence and quantity of specific pollutants, in addition to information on all wastestreams contributing to effluent. J.A. 330.

As discussed in greater detail below, this Court in *Piney Run Preservation Association v. County Commissioners of Carroll County, Maryland*, 268 F.3d 255 (4th Cir. 2001), approved EPA's interpretation of the permit shield provision, as

applied and expounded upon in a formal adjudication before the agency's

Environmental Appeals Board.  The Court there held that "as long as a permit

holder complies with the CWA's reporting and disclosure requirements, it may

discharge pollutants not expressly mentioned in the permit.  The only other

limitation on the permit holder's ability to discharge such pollutants is that the

discharges must be reasonably anticipated by, or within the reasonable

contemplation of, the permitting authority."  *Id.* at 268.

### III.    Straightforward Application of *Piney Run* and *Ketchikan Pulp* Demonstrates That A&G's Selenium Discharges are Not Protected by the Permit Shield

The permit shield and EPA permit shield interpretation have been fully

addressed by this Court and there is no question in this appeal that *Piney Run* is the

central and controlling case.  This Court in *Piney Run* examined and agreed with

the permit shield analysis in *In Re Ketchikan Pulp Co.*, 7 E.A.D. 605 1998 WL

284964 (Appeal No. 96-7 May 15, 1998).  Consequently, *Ketchikan Pulp* also

provides important and pertinent precedent.

As explained above, A&G's VA/NPDES permit application instructions

clearly required the company to provide data on a list of pollutants, including

selenium, for each outfall.  *Supra* at 6-7; J.A. 356.  A&G has never alleged, much

less demonstrated, that it complied with this express disclosure requirement and

there is nothing in the record to even suggest that it did so. As such, A&G's claims

16

that "*no* evidence indicates A&G's permit application failed to satisfy CWA's disclosure-related requirements" and that A&G "provided various numerical data requested by the application" are patently false.  *See* A&G Brief at 13, 16.

Because the permitting authority must have adequate information to properly craft effluent limitations to meet the requirements of the CWA and protect water quality, both EPA and this Court require permittees to fully comply with all disclosure requirements to obtain the protection of the permit shield.  A&G's failure to comply with the unambiguous selenium disclosure requirements in its VA/NPDES application, which prevented the DMME from assessing the threat posed by the discharges and imposing proper permit limits, precludes A&G from taking advantage of the permit shield's protections.  It would be perverse to reward A&G's malfeasance with a shield against liability for its ongoing discharges of harmful amounts of a toxic pollutant.

### a.    Unlike A&G, the permit applicant in *Piney Run* specifically disclosed the pollutant, and that disclosure was critical to finding the permit shield applicable.

*Piney Run* involved application of the permit shield to the discharge of heat by a public wastewater treatment plant into Piney Run, a stream in Maryland.  This Court there found determinative that the permit applicant, in contrast to A&G in this case, specifically disclosed heat as a pollutant during the permit application process.  *Id.* at 271.

Before concluding that the heat discharges were shielded, however, the Court applied the two-step analysis required by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) to determine if EPA's interpretation of the shield merited deference. The Court first found that CWA § 1342(k) was ambiguous because it did not explicitly explain the scope of permit shield protection. 268 F. 3d at 267. The Court then considered the EPA's construction of § 1342(k), *i.e.*, that the NPDES permit covers all pollutants disclosed to the permitting authority during the permit application process. *Id.* The Court, applying *Chevron* deference, found EPA's construction reasonable. It thus held that "[t]o the extent that a permit holder discharges a pollutant that it did not disclose, it violates the NPDES permit and the CWA." *Id.* at 268. That phrase alone, which is the law in this Circuit, is fatal to A&G's appeal.

Further, the *Piney Run* court reasoned that "[b]ecause the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority during the permit application process . . . do not come within the protection of the permit shield." *Id.* at 268; *see also U.S. v. Tennessee Gas Pipeline Co.*, 1993 WL 594155 at *7 (W.D. La. April 14, 1993) (refusing to grant defendant's motion for

summary judgment for liability on PCB discharges despite defendant's compliance with its NPDES permit, which did not limit PCBs).

Thus, *Piney Run* sets forth two independent yet related requirements. A permit shield can only apply if both requirements are met:

> [A]s long as [1] a permit holder complies with the CWA's reporting and disclosure requirements, it may discharge pollutants not expressly mentioned in the permit. The only <u>other</u> limitation on the permit holder's ability to discharge such pollutants is that [2] the discharges must be reasonably anticipated by, or within the reasonable contemplation of, the permitting authority.

*Id.* at 268 (emphasis added); *see also id.* at 271–72 (applying the two-part test). Thus, "adequate disclosure" by the permit applicant at the time of application is the central concept, and an absolute requirement. *Id.* at 267. Without adequate disclosure, there is no permit shield.

After determining the scope of the shield, this Court turned to the applicant's disclosures. The Court found that the "[t]he MDE and the Commissioners each testified that the Commissioners informed the permitting authority that the Plant was discharging heat during the permit application process." *Id.* at 271. The Court then found that, based upon those disclosures, the permitting agency reasonably contemplated the discharge of heat, as further shown by the permittee's reports of heat discharges to the agency. *Id.* at 271–72.

*Piney Run* very clearly speaks in terms of the disclosure of pollutants, not, as A&G argues, the mere disclosure of general industrial categories. "[A] permit

holder is in compliance with the CWA even if it discharges pollutants that are not listed in its permit, as long as it only discharges <u>pollutants</u> that have been adequately disclosed to the permitting authority." *Id.* at 268 (emphasis added). *Piney Run* holds that adequate disclosure is a necessary element of permit shield protection. An agency's "reasonable contemplation" cannot excuse a lack of adequate disclosure, but is rather an additional requirement to receive the protection of the permit shield.

As to reasonable contemplation, there was none. *Piney Run* makes clear that the application disclosures are the very foundation of the permit authority's contemplation. Faced with no toxic pollutant data to contemplate, the permit authority could only consider the pollutants disclosed.

Further, A&G pled the permit shield as an affirmative defense. J.A. 46. *See also Ohio Valley Environmental Coalition, et al. v. Fola Coal Co.*, 2013 WL 9709957 at *10 (S.D. W. Va. 2013) (referring to and analyzing the "permit shield defense"). As an affirmative defense, it was A&G's burden on summary judgment to show that an issue of material fact existed on both elements of the defense. *David v. Alphin*, 704 F.3d 327, 339 (4th Cir. 2013) (articulating the burden for an affirmative defense on summary judgment). That is because if A&G fails to prove either prong, then the entire defense fails. There is no utility in a trial on only one of the two required elements.

20

Even if the permit shield is not considered an affirmative defense, *Piney Run* makes plain that unless both prongs are satisfied, there is no shield. Here, the parties acknowledge that, with regard to the first prong, there was no selenium disclosure at all.

The lack of DMME's contemplation of selenium discharges from A&G's mine is further shown by A&G's acknowledgement that its permit does not address selenium in any fashion, and its acknowledgement that selenium was not within the scope of VA/NPDES permit 0082052. In a document written by A&G and submitted in the summary judgment record, Defendant described its selenium discharges:

> Issues with selenium have only been a recent development. There had been no discussion of selenium sampling in the past, so no efforts were made to describe a baseline level for the watersheds in question. Also VPDES permit 0082052 does not include monitoring requirements, nor limits, for selenium.

J.A. 359.

As discussed further below, a complete absence of selenium data cannot constitute adequate disclosure. This is unquestionably true where the permit application instructions specifically require selenium data for each outfall. Without adequate disclosure, there was no basis for the permitting authority to "reasonably contemplate" A&G's selenium discharges. Thus, A&G fails the test

21

articulated by this Court in *Piney Run*. A&G can only prevail if this Court

overrules *Piney Run* and A&G has offered no reason for the Court to do so.

    **b.**  **A&G's disclosures were far less complete than the disclosures in *Ketchikan Pulp*, where the permit applicant's failure to specifically identify individual pollutants was crucial to EAB's decision that the permit shield did not apply.**

   This Court in *Piney Run* examined *Ketchikan Pulp* in some detail and held

that "The EPA in *Ketchikan Pulp* . . . outlined the proper structure for the

permitting process." 268 F.3d at 268. Thus, *Ketchikan Pulp* demonstrates the

correct application of the CWA's permit shield. It also provides an example of a

permittee that failed to demonstrate the elements necessary for permit shield

protection. The Ketchikan Pulp Mill's permit application disclosures were far

more detailed than the disclosures that A&G relies on to claim the permit shield

defense. The case thus demonstrates that A&G falls far below the standard.

   In *In Re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964 (Appeal No.

96-7 May 15, 1998), the EPA Environmental Appeals Board considered a pulp

mill's liability for discharges of flocculent, sludge and cooking acid in light of the

company's NPDES permit, which did not specifically limit those pollutants. The

board held that applicability of the permit shield depends upon adequate disclosure

of pollutants at the time of application; the applicant's subjective knowledge is not

a factor. *Id.*

The pulp mill made disclosures that were far more detailed than the disclosure – "bituminous coal mining" – that A&G asserts is sufficient in this appeal. *See, e.g.*, A&G Brief at 16. The Appeals Board, however, found those disclosures insufficient to "shield" the discharges at issue. The pulp mill's disclosures were considered in detail:

> Tackling the issues regarding the scope of the permit and the availability of the shield defense first, the Presiding Officer concluded based on an analysis of the permit and permit application that neither flocculent nor cooking acid was expressly covered under the permit, as neither had been set forth in KPC's application. Init. Dec. at 23-25. The Presiding Officer rejected KPC's argument that the reference to filter backwash in the permit application somehow included flocculent, since he determined that flocculent was a heavier substance which was drained through a separate line. *Id.* at 24. He also rejected KPC's contention that its disclosure of "maganese" [sic] and "sulfite" sufficiently disclosed the discharge of "magnesium bisulfite" (cooking acid), finding that magnesium bisulfite was a wholly different chemical compound than "maganese" [sic] or sulfite separately. *Id.*

*Id.* (emphasis added). The Appeals Board found those disclosures insufficient. It noted that the presiding officer's initial "conclusion was based on the Presiding Officer's determination that KPC had not complied with the disclosure requirements of either the application or the permit application regulations." *Id.*

*Ketchikan Pulp* also squarely addressed the adequacy of a discharger's "wastestream" disclosures:

> [T]he Agency has determined that the goals of the CWA may be more effectively achieved by focusing on the chief pollutants and wastestreams established in effluent guidelines and disclosed by

> permittees in their permit applications, rather than by attempting to
> identify the hundreds or thousands of pollutants potentially present in
> permittees' wastestreams.

*Id.* (emphasis added).  The Appeals Board also explained the nexus of an applicant's disclosure and the agency's contemplation of pollutants, holding that "the permit applicant's disclosures during the application process as to the wastestreams which may potentially be discharged, and the permit authority's knowledge as a result of that disclosure, are critical factors in determining whether the Shield defense is applicable."  *Id.*  "[T]he disclosures made by permit applicants during the application process constitute the very core of the NPDES permitting scheme" because "[i]naccurate or incomplete disclosures could undermine the purpose of the CWA by denying the permit writer the information necessary to write a permit to adequately protect the environment."  *Id.* at 622, 626.

Crucially, the Appeals Board also made explicit that an inquiry into the applicant's subjective knowledge is unnecessary because it is irrelevant.  Instead, applicants have an affirmative duty to be aware of pollutant levels, especially as to toxic pollutants.  The Appeals Board noted the EPA policy:

> EPA proposed that existing industrial dischargers be required to
> submit in their NPDES permit applications, in addition to other
> information, detailed information concerning discharges of toxic (and
> certain other) pollutants.
> The requirements reflect the Agency's belief *** that dischargers have
> a duty to be aware of any significant pollutant levels in their

24

> discharge. In addition, they serve two specific purposes. Most important, they provide the information which permit writers need to determine what pollutants are likely to be discharged in significant amounts and to set appropriate permit limits. Second, they will be used as a basis for application-based notification requirements ***.

*Id.* (quoting 45 Fed. Reg. 33, 516, 33, 526 (May 19, 1980)) (emphasis added). The Appeals Board then noted that "while the above comments refer primarily to toxic pollutants, which were and continue to be a primary target of the NPDES regulations, the Agency's reliance on a discharger's accurate disclosures is not limited to the identification and control of toxics." *Id.*

That policy excerpt and comment highlight two important features. First, information on toxic pollutants must be especially detailed. A&G's barebones disclosure that it is operating a "bituminous coal mine" is unquestionably not a detailed disclosure of toxic pollutants. Bituminous coal mines are not a homogenous group with a uniform wastestream. Some mines discharge dangerous levels of selenium, mercury, aluminum, and other toxic pollutants. Other mines do not. Different bituminous coal mines, or even different outfalls within a single mine, thus require different effluent limitations to ensure that their discharges do not harm the environment. Indeed, that variability explains the requirement in the VA/NPDES coal mine permit application that the applicant fully characterize the discharge from each outfall by testing for a wide range of toxic pollutants. J.A. 356. Simply disclosing that an applicant will operate a bituminous coal mine does

25

not adequately characterize the discharge such that the permitting authority can judge the threat posed and craft protective permit limits.

Second, applicants have an affirmative duty to be aware of any significant pollutant levels in their discharge. A&G clearly failed in this duty. Indeed, its repeated professions of ignorance form the cornerstone of its appeal. A&G has never alleged or demonstrated that it took any measure at all to determine whether toxic pollutants were discharged from its outfalls.

Moreover, the EAB in *Ketchikan Pulp* directly considered and rejected the argument A&G now makes. A&G argues unpersuasively that, while it was entirely ignorant of selenium, the permit authority had knowledge of selenium in the general area of its mine. A&G Brief at 17. Likewise, the Ketchikan Pulp Company argued that it need not disclose its potential to discharge cooking acid from its pulp mill because the agency was "generally aware" that such material was subject to spills at similar facilities. 7 E.A.D. 623. That is A&G's argument: that because DMME was aware that selenium was in the area generally, selenium is implicitly covered by the permit. Setting aside the fact that A&G failed to create an issue of fact regarding such "general knowledge,"[3] the main problem with that argument is that the *Ketchikan Pulp* Board rejected it.

---

[3] The only evidence of DMME's "general knowledge" of selenium at the time of permit issuance that A&G timely submitted to the District Court was a letter written *by A&G* to DMME *after* the permit was issued. J.A. at 84.

A&G contends that "A&G differs from *re Ketchikan Pulp Co.*, where the permittee failed to disclose important aspects of its industrial processes." A&G Brief at 16. A review of the case, however, shows that the EAB's analysis focused primarily on disclosure of pollutants – flocculent, sludge, and cooking acid – not industrial processes. In addition, Ketchikan Pulp Mill actually had a better argument than A&G as to the permit application requirements. Ketchikan Pulp Mill argued that it complied with the agency permit application requirements, which did not specifically request information on flocculent or cooking acid. A&G has no such argument, as the application clearly and specifically required selenium data "for each outfall." J.A. 356.

A&G also relies upon *Atlantic States Legal Foundation v. Eastman Kodak*, 12 F.3d 535 (2d Cir. 1993).[4] The *Eastman Kodak* court also deferred to EPA's construction of the Clean Water act permitting requirements, and held that the permitting authority must reasonably anticipate a particular discharge in order for the shield to apply. *Id.* at 358. The *Ketchikan Pulp* court summarizes *Eastman Kodak*, and that summary refutes A&G's characterization of the case: "*Eastman Kodak* therefore stands for the proposition that the discharge of unlisted pollutants

---

[4] The weight of that decision is limited because it pre-dates both EPA's Permit Shield Policy and the *Ketchikan Pulp* decision and thus did not account for EPA's most recent reasonable interpretation of the statute.

is permissible when the *pollutants* have been disclosed to permit authorities during the permitting process." 7 E.A.D. at 625 (emphasis added).

*Ketchikan Pulp*, then, very clearly sets a bar for a permit applicant's disclosures, a bar that A&G falls far below. The applicant's pollutant disclosures must be quite specific, and those specific disclosures are necessarily the foundation of the permit authority's knowledge of that applicant's likely discharges. Further, failure to comply with permit application disclosure requirements will be, as it was for Ketchikan Pulp Mill, fatal to the attempt to gain protection of the permit shield. In light of *Ketchikan Pulp*, it is inconceivable that the shield would apply to an undisclosed toxic pollutant simply because the applicant notified the permit authority that the applicant will engage in the incredibly broad activity of "bituminous coal mining." If A&G's argument were correct, Ketchikan Pulp Mill's disclosures would have been sufficient as soon as the mill disclosed its own name, which generally describes its industrial activity.

### IV.    In Addition to Violating the VA/NPDES Coal Mine Application Instructions, A&G's Disclosures Were Inadequate Under Federal and State Regulations Governing Toxic Pollutants, Regardless of A&G's Subjective Knowledge.

A&G has very little to say about the permit application instructions' plain requirement that selenium data be submitted by all applicants for each outfall. There is little A&G can say, because the requirement is so clear, and A&G's failure so complete. The failure is fatal to A&G's affirmative defense. In addition

to ignoring the requirements of its permit application, A&G has also incorrectly characterized the regulations that prescribe the bare minimum information that an NPDES permit applicant must provide.  Thus, whether viewed in light of the requirements of federal regulations, state regulations, or the unambiguous VA/NPDES coal mine application instructions, A&G fails on all counts.

Forty C.F.R. § 122.21 is the federal regulation governing application for a NPDES permit, and the provision is applicable to the states.  The First Group of Amici argue that 40 C.F.R. § 122.21 furthers A&G's argument.  First Amicus Brief at 14-15.  A&G makes a similar argument, but critically misquotes the regulation.  A&G Brief at 14.  Both A&G and the amici rely on the regulation to assert that A&G's ignorance of selenium relieves A&G of any disclosure responsibility as to toxic pollutants.  That is false.  An examination of the regulation establishes that A&G failed to make the bare minimum disclosures required by federal and state law, regardless of its subjective knowledge and regardless of the VA/NPDES permit application instructions.

Subsection (g) of the regulation governs disclosure requirements for "existing manufacturing, commercial, mining, and silvicultural dischargers."[5]  The

---

[5] This regulation does not apply to certain existing operations that discharge wastewater not subject to effluent limitations guidelines.  Surface mines such as the Kelly Branch mine are subject to coal mining effluent limitations guidelines and thus fall within the purview if this regulation.

subsection then lists information that a discharger "shall provide."  40 C.F.R. §

122.21(g).   Subsection 122.21(g)(7)(vi)(B) provides:

> Each applicant must indicate *whether it knows or has reason to believe* that any of the pollutants listed in table II or III of Appendix D of this part … [which lists toxic pollutants and includes selenium] for which quantitative data are not otherwise required under paragraph (g)(7)(v) of this section [which refers to toxic metals, cyanide, and total phenols] are discharged from each outfall.

*Id.* (emphasis added).  This is plainly a requirement to make an affirmative

indication, regardless of the applicant's subjective knowledge.  That is, each

applicant "must indicate" whether the applicant knows or has reason to believe the

listed pollutants will be discharged.  If the applicant has no such knowledge or

reason, it must make an indication accordingly.  Complete absence of information

is not an indication at all.  It is just a void.  A&G failed to make any indication

pursuant to 40 C.F.R. § 122.21(g)(7)(vi)(B).

A&G, for its part, quotes the regulation as saying that pollutants must be

disclosed  "if [the applicant] knows or has reason to believe that they will be

present in the discharges from any outfall."  A&G Brief at 14.  A&G has

misquoted the regulation.  The misquote is not trivial, as it materially affects the

applicant's obligations.  The word "if" does not appear in the subsection.  The

applicant is not relieved of a toxic pollutant disclosure obligation on account of

ignorance.  Instead, even an honestly ignorant applicant must affirmatively indicate

that it has no reason to believe that toxic pollutants will be present. A&G's permit application is on record, and A&G made no such disclosure. J.A. 337-352.

Further, this regulation is by its own terms a bare minimum. The regulation provides that "Applicants for State-issued permits must use State forms which must require at a minimum the information listed in the appropriate paragraphs of this section." 40 C.F.R. § 122.21(a)(2)(iv). Virginia has gone beyond the minimum. It has explicitly required in its permit instructions that applicants collect and submit toxic pollutant data, specifically including total selenium, for each of the applicant's outfalls, or indicate if and where such information is on file with the permitting authority. J.A. 356.

Virginia incorporates the federal requirements into its regulations. 9 VAC 25-31-100(H)(7)(g). This regulation contains virtually the same language as its federal counterpart:

> Each applicant must indicate whether it knows or has reason to believe that any of the pollutants listed in Table II or Table III of 40 CFR Part 122 Appendix D (the toxic pollutants and total phenols) for which quantitative data are not otherwise required under subdivision 7 e of this subsection, is discharged from each outfall.

31

*Id.* Again, there is no way to avoid disclosure through ignorance. Virginia makes clear that the applicant must make an affirmative indication regarding toxic pollutants such as selenium. A&G plainly made no such indication.[6]

Virginia then took the additional measure of requiring data for toxic pollutants. This extra requirement is the state's prerogative, as expressly allowed by 40 C.F.R. § 122.21(a)(2)(iv). A&G failed to make any such disclosure. By ignoring the requirement to provide selenium data, A&G deprived the permitting authority any opportunity to reasonably contemplate the ongoing and unquestionably high levels of selenium discharges.

The Second Group of Amici assert that "A&G appears to have satisfied all permit application requirements." Second Amici Brief at 12. As discussed above, that is simply wrong, and the Amici's assumption on that count undermines the premise of their entire argument. Amici argue that in this case "the question is whether the permit authorized the discharge of a specific pollutant (selenium), where the permittee described in its permit application the waste stream containing

---

[6] A&G argues that SAMS have "conceded" that they have no claim for a violation of the permit application requirements. A&G Brief at 18. A&G argument is misleading. SAMS did note in an earlier brief in the District Court that it knows of no direct legal claim, *i.e.*, a cause of action, for violation of NPDES application disclosure requirements. That is true. SAMS did bring a claim for an unpermitted discharge, however. A&G is liable for such discharge if the permit shield does not apply, and the shield does not apply to an applicant that failed to make adequate disclosures. Thus, SAMS' claim is for an unpermitted discharge under the Clean Water Act. A&G, through its failure to make adequate disclosures, cannot avail itself of the permit shield.

that pollutant, but the specific pollutant was not reported as believed present." Second Amici Brief at 7. That is a very careful description of the disclosure that makes it appear fuller than it was. It's not just that A&G did not report selenium as "believed present" or "believed absent." It would take some affirmative assertion of belief to report the pollutant as believed absent or present. Instead, A&G made no inquiry and it made no disclosure. As shown above, that is not adequate disclosure as a matter of regulations and as a matter of permit application instructions.

As discussed above, the First Group of Amici are wrong in asserting that A&G was "under no obligation to disclose such discharges in its permit application." First Amici Brief at 6. A&G was under a direct and explicit obligation to disclose such discharges. The First Amici also assert that an "adequate disclosure" is "one that 'complies … with the Clean Water Act's disclosure requirements.' *Piney Run*, 268 F.3d at 259." SAMS agrees with that construction. A&G failed to make a disclosure that complied with the Clean Water Act's minimum requirements.

Thus, both state and federal regulations establish a bare minimum disclosure of the applicant's knowledge of toxic pollutants. A&G made no such disclosure. Faced with these requirements, A&G clearly failed to make the "adequate disclosures" that are a necessary element of the *Piney Run* permit shield defense.

Despite *Piney Run*'s lack of a subjective knowledge element, A&G nonetheless argues vehemently about its subjective knowledge.  A&G, evidently based upon its material misreading and misquoting of the regulations cited above, founds its appeal on the following standard: "Thus, the standard is *not* 'did A&G disclose selenium in its application?' The standard, instead, is 'did A&G know or have reason to believe that selenium would be discharged such that it should have been disclosed in its application?'"  A&G Brief at 15.  That is not the standard, as no such test is articulated in *Piney Run*.  A&G's proffered standard has no basis, either in regulation or case law.  A&G's proffered standard has no immediate citation, but the brief suggests that the purported source of the standard is the federal regulation governing application requirements.  As discussed above, A&G materially misquoted the regulation and the regulation refutes the argument that ignorance excuses adequate disclosures.  Instead, the regulations support the EPA policy that applicants have an affirmative duty to know the pollutants they discharge, especially when the pollutants are toxic.

Finally, A&G makes no mention of two clear and binding permit conditions. Either of them is sufficient to make clear that the permit does not allow the toxic discharges that A&G never disclosed.

Management Requirement Condition (n)(2) provides in full: "The discharge of any pollutant more frequently than, or at a level greater than that identified and

34

authorized by this permit, shall constitute a violation of the terms and conditions of this permit." J.A. 304. Selenium is not "identified and authorized" in the permit. This provision is not ambiguous, and it makes clear that the permit does not implicitly allow A&G's selenium discharges.

Further, a separate provision, Special Condition (p)(2), provides in full:

> Any and all product, material, industrial wastes, and/or other wastes resulting from the purchase, sale, mining, extraction, transport, preparation and/or storage of raw or intermediate materials, final product, by-product or wastes, shall be handled, disposed of, and [sic] and/or stored in such a manner so as not to permit discharge of such product, materials, or industrial wastes and/or other wastes to State waters, except as expressly authorized herein.

J.A. 305. Condition (p)(2) was cited by the district court. J.A. 500. This provision is not ambiguous. A&G has not offered any construction of this provision that would favor its argument. Selenium, a toxic pollutant, is certainly "material" and "waste," and its discharge from A&G's ponds results from A&G's mining. The selenium is assuredly being discharged into State waters, and it is not expressly authorized anywhere in the permit.

NPDES permits are construed as contract provisions. *Piney Run Preservation Ass'n v. County Com'rs of Carroll County, Maryland*, 268 F.3d 255, 269 (4th Cir. 2001). This provision, like Condition (n)(2), cannot be construed to implicitly allow selenium discharges. Taken together, the permit conditions further undercut A&G's argument that its selenium discharges – never disclosed by

A&G, required to be disclosed in the permit application instructions, and disclaimed from coverage by the permit itself – are implicitly permitted.

## V.    A&G's "Subjective Knowledge" and "General Knowledge" Arguments are Untenable Obfuscations Already Rejected by This Court.

A&G asserts in this appeal that the Court's analysis must turn on A&G's subjective knowledge of selenium at the time of application.  A&G Brief at 15. That position has no support in the precedent of this Court, and it is refuted by regulation and by the permit application itself.  However, even taken on its own terms, A&G's protestations of ignorance do not hold together.  A&G maintains both its ignorance and the impossibility of ever discovering selenium during permit application, and yet an examination of A&G's own flimsy evidence demonstrates that A&G (1) knew about selenium to the same extent as the agency, and (2) A&G can and did test for selenium in connection with a different permit application.

As to knowledge of selenium, the district court found that "the evidence simply does not support a conclusion that DMME considered what A&G did not." J.A. 512.  This finding is correct, and it highlights the failure of A&G's argument. A&G emphasizes its own ignorance and the depth of DMME's knowledge. However, A&G failed to produce more than a scintilla of evidence on either of the *Piney Run* prongs.  As the District Court concluded, "A&G has offered no

evidence that DMME anticipated a discharge of selenium from this particular mine." J.A. 513.

A&G argues vehemently that is had no reason to believe that selenium would be discharged from its outfalls. However, the same information that supposedly provided DMME with its "general knowledge" of selenium allegedly came from water testing performed by A&G itself, pursuant to an A&G permit application. J.A. 84. This bears emphasis for two reasons.

First, the letter, even if accepted, shows that A&G had the same "general knowledge" of selenium as the agency, since the knowledge came from a single source: A&G's own selenium testing elsewhere. Thus, even under A&G's reasoning, the agency had precisely the same grounds for contemplating selenium discharges at the Kelly Branch mine. Thus, if A&G was ignorant of selenium, as it now professes, so was the agency, and there is no permit shield because there was no adequate disclosure and no reasonable contemplation. If, on the other hand, the agency had enough information to suspect selenium at the Kelly Branch mine, then so did A&G, and yet it failed to make any selenium disclosure. The end result is the same: no permit shield. A&G cannot maintain its position, which depends on assertions of its own complete ignorance and the agency's deep knowledge, all based upon the same water sampling by that very mining company.

Second, although A&G protests the impossibility of water sampling, it is clearly possible to test water for selenium in connection with a permit application. Indeed, A&G asserts that it did so for the Ison Rock Ridge surface mine. J.A. 84. In light of A&G's own letter and its own selenium testing in connection with a different permit application, A&G's strenuous arguments about the impossibility of selenium testing ring hollow.

The letter, however, is nothing more than a self-serving scintilla of evidence. A&G argues that it is the only evidence of the permit authority's reasonable contemplation of selenium at the Kelly Branch mine. J.A. 83-84. This letter was sent to DMME well after the Plaintiffs' September 2011 request for a citizen inspection of the mine due to alleged Clean Water Act violations. Thus, A&G already faced potential litigation at the time of the letter. The letter was written well after the A&G permit application and issuance. A&G's self-serving characterization of DMME's knowledge is, at best, a weak and unpersuasive scintilla of evidence. Even the amici readily acknowledge that the letter is "not overwhelming, to be sure." First Amici Brief at 25. That is a profound understatement. A coal company, facing well-founded allegations of Clean Water Act violations, wrote a letter to the permit authority telling the authority what it allegedly knew "quite some time ago" at the time of permit issuance. Elsewhere, and also in 2011, however, the company asserts that selenium is a "recent

38

development" and that "there had been no discussion of selenium sampling in the past." J.A. 359.

It makes sense to avoid the "ignorance defense" that A&G proffers as a new legal standard. A permit applicant may not simply put its head in the sand and escape its responsibility for toxic discharges. A&G's argument depends on the assertion that an applicant can ignore permit application requirements at its election, and that the very refusal to comply with the instructions absolves the applicant of any further responsibility. By A&G's reasoning, as long as it simply refuses to conduct any testing on future permits, it can claim ignorance and, consequently, the protection of the permit shield. Litigation of an enforcement action would require establishing the applicant's subjective knowledge in years past. That is not the law. A&G must make "adequate disclosures." *Piney Run*, 268 F. 3d at 269. The adequacy of those disclosures is determined by the permit application requirements and state and federal regulations, not by the extent of the practically unknowable knowledge of the applicant. The failure to make such disclosures logically should not work to A&G's benefit, and under *Piney Run*, it does not.

For their part, the Second Group of Amici argue that "EPA's policy recognizes that a permittee should not be held responsible for what it cannot know or control with respect to its discharge." Second Amici Brief at 13. That argument

has no bearing on this action.  A&G certainly can test its water for the presence of toxic metals, read and know the results, and send the analyses to the permit agency. It has done so in other permit applications, by its own admission.  A&G is also capable of treating toxic selenium discharges, as other coal companies have demonstrably done across Appalachia.  *See, e.g., Ohio Valley Envt'l Coalition v. Patriot Coal Co.*, 2011 WL 6101921, *6 (S.D. W. Va. 2011) (referring to orders that a coal operator install selenium treatment facilities); *U.S. v. Arch Coal, Inc.*, 829 F. Supp. 2d 408, 413, 417 (S.D. W. Va. 2011) (referring to types and effectiveness of selenium treatment).  This case, then, is definitely not about what A&G "cannot know or control with respect to its discharge."  The case is about what other permit applicants routinely know and control.

Because of the fundamental importance of the permit application and the permit process, and A&G's admission that it submitted no selenium data in its application, the 2011 letter cannot overcome A&G failure to make the disclosures required by law.  The permit applicant's subjective knowledge is not relevant to any inquiry under *Piney Run*, and it not pertinent to whether A&G followed the permit application instructions.

40

**VI.    The District Court's Decision to Disallow the Untimely Submission of Inadmissible Evidence Was Justified and Was Not an Abuse of Discretion.**

**a.    The District Court decision is correct.**

In this appeal A&G challenges the District Court's decision to disallow the submission of untimely and inadmissible documents in support of A&G's summary judgment motion.  However, A&G fails to explain how the District Court abused its discretion in light of A&G's unjustified, unexplained delay.  Indeed, A&G's opening appeal brief does not cite a single case in support of its argument, and the amici notably do not support A&G's argument on this issue.  The District Court made an imminently reasonable decision based on the correct analysis.

In this action, summary judgment motions and supporting exhibits were due on April 18, 2013.  J.A. 49 (scheduling order).  Plaintiffs put the permit application instructions squarely at issue by including the entire instructions as an exhibit and by clearly arguing their significance. J.A. 35; Pls'. Mem. in Supp. of Summ. J. at 21-22 (District Court CM/ECF Doc. 55).

A&G made no response to the argument on brief.  On May 22, 2013, the District Court issued an order cancelling the June 17, 2013 trial date and instead setting a hearing on the cross motions for summary judgment on June 17.  The hearing was held and A&G was given another opportunity to articulate its position regarding the permit application requirements.  J.A. 456-88 (hearing transcript).

Following the hearing, cross motions for summary judgment were ripe for decision.

On June 21, A&G filed a motion styled "Defendant A&G's Motion to Supplement Evidence in Support of Its Motion for Summary Judgment." J.A. 489. The motion did not cite any rule or doctrine under which permission was sought.[7] The supporting brief did not even cite a single case, and made a single reference to Rule 26(e), which governs discovery procedures and not summary judgment. It is incredible that A&G would now assert that the District Court abused its discretion when faced with such an opaque, untimely and unsupported motion.

In this action, the specified time for submitting evidence in support of a motion for summary judgment, as defined in the Court's July 25, 2012 Scheduling Order, expired long before the hearing on those motions. J.A. 52. Factual discovery lasted for six months and ended on January 28, 2013; summary judgment motions and supporting exhibits were due on April 18, 2013. Defendant filed its motion for summary judgment on April 18, 2013 and it was obligated to articulate and support its affirmative defense by that date. It failed to do so. It

---

[7] A&G asserts that "prior to the District Court ruling on the cross motions for summary judgment, A & G moved the District Court pursuant to Fed. R. Civ. P. 56(e) to supplement evidence in support of its motion for summary judgment." A&G Brief at 23 (citing J.A. 489). There is not a single reference to Rule 56(e), or any federal rule, in A&G's motion. J.A. 489-90. The assertion that the motion was made "pursuant" to that rule is disproven by the record.

failed to submit any response, either by argument or proffered exhibit, to Plaintiffs' position regarding the permit application instructions.

In the absence of any supporting citation by A&G, the District Court construed the motion as a motion pursuant to Rule 6 of the Federal Rules of Civil Procedure, which governs extensions of time. The District Court was correct to apply Rule 6(b), as A&G, by its own description, gathered new evidence following the conclusion of the disclosures, depositions, summary judgment briefing and summary judgment hearing, seeking to use the new information in support of its own motion for summary judgment.[8]

Federal Rule 6(b) provides: "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: …(b) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). "In determining whether a party has shown excusable neglect, a court will consider: (1) the danger of prejudice to the non-moving party; (2) the length of delay and its potential impact on judicial proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Colony Apartments v. Abacus Project Mgmt., Inc.*, 197 F. App'x 217, 223

---

[8] The evidence was only "new" to A&G. The letter was in existence and available to A&G for the entirety of the litigation leading up to the expiration of the District Court's deadlines.

(4th Cir. 2006) (unpublished). The reason for the delay is the most important factor. *Id.*

In ruling on such a motion, a court must first determine whether "excusable neglect has been shown by the party failing to comply with the time provisions." *B & J Enters. v. Giordano*, 329 Fed. Appx. 411, 415 (4th Cir. 2009). If the movant fails to show excusable neglect, the motion must be denied. *Id.* However, showing excusable neglect is merely a threshold: "even upon a showing of 'excusable neglect,' whether to grant an enlargement of time still remains committed to the discretion of the district court." *Thompson v. E. I. DuPont de Nemours & Co.*, 76 F.3d 530, 531 n.2 (4th Cir. 1996).

The excusable neglect standard is demanding. The Fourth Circuit has consistently held that excusable neglect "is not easily demonstrated, nor was it intended to be." *Thompson*, 76 F.3d at 534; *see also Gaskins v. BFI Waste Servs.*, 281 Fed. Appx. 255, 260 (4th Cir. 2008) (showing excusable neglect "present[s] obvious difficulties" and is "an uphill battle"). As such, a court should find excusable neglect "only in the *extraordinary cases* where injustice would otherwise result." *Symbionics Inc. v. Ortlieb*, 432 Fed. Appx. 216, 220 (4th Cir. 2011) (emphasis in original).

Federal courts have consistently "been ill disposed to admit affidavits that were submitted after the summary judgment hearing." *Hickenbottom v. Nassan*,

2007 U.S. Dist. LEXIS 24336, *34 (W.D. Pa. 2007). At this stage in the proceedings, supplementing the record has a particularly invidious impact on judicial proceedings. As one federal court has explained:

> Like the parties, [the Court] prepared for the hearing as, presumably, we are supposed to do: by thoroughly reviewing the motions, briefs and exhibits pertinent to the motion, we were able to commence the hearing with a comprehension of the major issues in contention [and] an anticipation of the arguments to be made . . . All that preparation effectively went for naught when [the moving party] proposed to submit new material. We believe that *this is the type of evil the rules were adopted to avoid; by offering affidavits in an untimely fashion, the [movant] frustrated the prompt adjudication of this matter.* Therefore, the . . . error should not be held to be "excusable neglect."

*In re: Earl Roggenbuck Farms*, 51 B.R. 913 (Bank. E. D. Mich. 1985) (emphasis added). In many cases, allowing an untimely affidavit will "require the Court to reopen discovery [and] require the parties to undergo the expense of additional rounds of depositions and supplemental reports and briefing." *Snoznik v. Jeld-Wen, Inc.*, 2010 WL 1924483, *26 (W.D.N.C. 2010). In other words, allowing untimely evidence is often "completely disruptive to the trial schedule." *Id.*

Federal courts have held that mere "failure to address issues raised by [opposing counsel] in its motion for summary judgment" is not excusable. *Edwards v. Princess Cruise Lines*, 471 F. Supp. 2d 1027, 1031 (N.D. Cal. 2007). The failure to collect and present evidence related to the theories before the court "may amount[] to neglect, but [it] is not excusable." *Id.* A court should not find excusable neglect where there is "evidence which could have been submitted," but

45

"was not because of tactical decision or neglect." *Marine Bank v. Meat Counter, Inc.*, 1986 WL 5217, *5 (N.D. Ill. 1986); *see also Estes v. King's Daughters Med. Ctr.*, 59 Fed. Appx. 749, 752 (5th Cir. 2003) (striking an affidavit is proper where parties "have had ample opportunity to develop their case . . . and have failed to do so within the [established] time frame").

As explained below, A&G failed to satisfy any of the elements of excusable neglect.

**Length of Delay**

As to the delay, A&G suggests that no pertinent deadline had passed at the time of its motion. A&G Brief at 14. That is wrong. Every summary judgment deadline was long past and the matter was ripe for decision. J.A. 52. A&G's motion, by its own styling, was submitted in support of its own motion for summary judgment.

A court is not required to consider evidence in support of summary judgment that was not submitted prior to the summary judgment hearing. *Orsi v. Kirkwood*, 999 F.2d 86, 91 (4th Cir. 1993) (affirming district court's refusal to consider documents that were presented on the morning of oral argument). The Fourth Circuit has unequivocally held that a district court properly excludes evidence for or against a summary judgment motion when the evidence is "offered . . . on the day of the hearing" and "was available . . . prior to the

hearing." *Orsi v. Kirkwood*, 999 F.2d 86, 91-92 (4th Cir. 1993).  Similarly, a court

properly strikes from the summary judgment record evidence "submitted two

months after the court's [discovery] deadline" without any "assertion of excusable

neglect." *B & J Enters.*, 329 Fed. Appx. at 415.  That holding applies precisely to

A&G.

**Reason for Delay**

> As the District Court noted:

> A&G has offered no reason why it could not have obtained this
> evidence during discovery or why it waited until after oral argument
> to contact DMLR to inquire about the agency's selenium disclosure
> policy for permit applications. A&G's failure to contact the agency
> prior to filing its summary judgment motion and briefs is inexplicable.

J.A. 505.

In this appeal, A&G's proffered reason for the delay is that it only

"realiz[ed] the focus of the District Court at oral argument."  A&G Brief at 24.

A&G does not offer any justification for failing to develop its defense during the

discovery phase of the action, nor any justification for ignoring Plaintiffs'

summary judgment argument pertaining to the permit application.  A&G's

proffered reason for the delay does not meet the strict standard.  For example, this

Court's decision in *B & J Enters. v. Giordano*, 329 Fed. Appx. 411, 415 (4th Cir.

2009), involved a similar two-month delay and similar submission of affidavits,

and the Court affirmed the striking of the proffered evidence from the summary

judgment record.

**Prejudice**

As to prejudice, A&G's motion, if granted, would have necessitated more

discovery, and thus would have delayed the action considerably.  A&G's

discharges are causing ongoing harm to the environment in violation of the Clean

Water Act.  Jon Lawson is an A&G representative who oversees surface mining

operations at the Kelly Branch mine, and he asserts in an affidavit that he procured

the letter that is the subject of A&G's motion.  J.A. 492-93.  Although SAMS did

depose Mr. Lawson during discovery, SAMS clearly did not have an opportunity

to depose Mr. Lawson regarding his post-hearing June 18, 2013 telephone call to

DMME, nor an opportunity to depose George Joey O'Quinn, the DMME

representative purportedly involved in the call.  Plaintiffs have not had an

opportunity to otherwise investigate the authenticity and effect of the very dated

1997 letter.

A&G argues in this Court that the District Court's focus at oral argument on

"the applicability of the permit shield" was a surprise to A&G that warranted

further discovery, evidence, and argument.  A&G, however, asserted the permit

shield affirmative defense in its Answer and should have developed evidence to

support that defense prior to the close of all discovery and summary judgment deadlines. J.A. 46 (A&G's July 2, 2012 Answer ¶81).

As to good faith, it was A&G's burden to establish its good faith before the District Court, and it provided no evidence in support.

A&G audaciously argues to this Court that there was no prejudice to SAMS because the document would have posed no difficulty *at trial*. "At the very most, Plaintiffs would have been tasked with examination of an EPA witness at trial that could speak to the authenticity of the letter and its contents. And, the deadline to disclose witnesses for trial had not yet passed at the time the motion was made to supplement evidence." A&G Brief at 25. That is irrelevant and absurd. A&G's motion is not for permission to submit an early proposed trial exhibit. It is a motion that A&G explicitly submitted for consideration on its own summary judgment motion. Every summary judgment event except for the issuance of the court's Order had passed.

A&G also argues that it never argued for a reopening of discovery "on an entirely new theory of law," so there could be no prejudice. A&G Brief at 24. A&G asserts that the material was not untimely because it related to its permit shield affirmative defense pled in its Answer. That is preposterous. Under A&G's blithe reasoning, untimely summary judgment evidence is never prejudicial, so long as it supports an argument or theory previously mentioned, even where that

49

argument had no evidentiary support.  That is a conflation of argument and evidence, and it does not make sense.  A&G cites no case law to support that contention, there is no case law to support that contention, and there is no merit to that argument.

A&G fails every element of excusable neglect, a demanding standard that A&G did not even identify in the subject motion, much less satisfy.  The best that can be said of A&G's motion is that it demonstrates a process that "may amount[] to neglect, but [it] is not excusable." *Edwards v. Princess Cruise Lines*, 471 F. Supp. 2d 1027, 1031 (N.D. Cal. 2007).

Further, as the District Court correctly noted, the 1997 EPA letter appears to be inadmissible hearsay.  It is a letter between representatives of two governmental agencies who are not parties.  The correspondence is not to or from A&G.  A&G offered it to prove the truth of the matters asserted in the letter.[9]  It is hearsay, and the District Court did not abuse its discretion in declining to admit it.

A&G argues that the District Court should have applied Rule 56(e) rather than Rule 6(b).  A&G Brief at 24.  The District Court correctly explained that Rule

---

[9] SAMS challenges the authenticity and applicability of the 1997 letter, but the substance of the letter is not an issue on appeal.  The District Court correctly noted that "Additionally, the letter instructs DMLR that if it plans to use its own metal analyses to satisfy individual companies' permit application disclosure obligations, it should so indicate in the application or the instructions for completing the application. The application submitted by A&G and the instructions thereto do not have any such indication." J.A. 506-507.

6(b) was proper, and also explained why Rule 56(e) would produce the same result.  J.A. 504.  As the District Court noted, Rule 56(e) is inapplicable because A&G did not merely fail to address another party's assertion of fact.  A&G affirmatively gathered evidence following all pertinent summary judgment deadlines and then submitted the purported evidence to support its own summary judgment motion.  Rule 56(e) provides that a court may "give an opportunity to support or address that fact" and that the court may also "consider the fact undisputed for purposes of the motion" or "issue any appropriate order."  Fed. R. Civ. P. 56.  A&G fails to provide any case citation or explanation for why the District Court's consideration of Rule 56(e) is an abuse of discretion.

The amici seem to recognize A&G's abject failure on this point.  The amici do not assert any abuse of discretion.  The First Amici appear interested in preserving their right to prove facts that A&G failed to prove: "In all events, amici respectfully request that this Court make clear that other permittees in similar cases are not precluded from relying on evidence of agencies' reasonable contemplation that was excluded or not offered in this case."  First Amici Brief at 7.  Of course, SAMS does not seek any preclusion of any non-party's rights in a separate, subsequent action.  SAMS does seek denial of A&G's appeal, which can be achieved through straightforward application of existing precedent in this Circuit.

In sum, this portion of A&G's appeal fails no matter which rule is applied. A&G submitted a motion to allow untimely summary judgment material on its behalf, failing to cite any pertinent rule or case. Allowance of the motion would have upended the case schedule, wasted resources of the parties and the Court, and deeply prejudiced SAMS. A&G's only proffered reason for the delay is that it did not realize the District Court's focus on A&G's own chief defense theory until after the summary judgment hearing. In denying such a motion, the District Court ruled properly and did not abuse its discretion.

## Conclusion

No party can avail itself of the permit shield without satisfying the test articulated in *Piney Run*. That party must demonstrate adequate disclosures to the permitting agency, or the permit shield cannot apply. There is no question that A&G, failing to submit selenium data as required on the face of the permit instructions, did not make adequate disclosures. The permit application forms the core of the permit authority's process, and is the core consideration in applying the permit shield. The permit authority was never given an opportunity to reasonably contemplate the toxic pollutant selenium, because no disclosure was made.

A&G's disclosures fall far below those of the wastewater treatment plant in *Piney Run* and the pulp mill in *Ketchikan Pulp*. A&G's argument that the words "bituminous coal mining" justify a permit shield for toxic pollutants cannot be

reconciled with *Piney Run*.  SAMS respectfully asks this Court to apply the clearly

articulated standards of *Piney Run* to the record of this action and deny A&G's

appeal.

February 3, 2014

/s/ Isak J. Howell
Isak J. Howell
LAW OFFICE OF ISAK HOWELL
117 East Washington Street
Suite 1
Lewisburg, WV  24901
(540) 998-7744

Joseph M. Lovett
APPALACHIAN MOUNTAIN
  ADVOCATES
P.O. Box 507
Lewisburg, WV  24901
(304) 645-9006

*Counsel for Appellees*

**Certificate of Compliance with Rule 32(A)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>12,510</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Isak J. Howell                    </u>
Isak J. Howell

*Counsel for Appellees*

Dated: February 3, 2014

**Certificate of Filing and Service**

I hereby certify that on February 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Allen W. Dudley, Jr.
JAMES C. JUSTICE COMPANIES, INC. & AFFILIATES
Legal Department
302 South Jefferson Street
Roanoke, VA  24011
(540) 776-7890

*Counsel for Appellant*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219